UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA A. BETHKE,

                Plaintiff,                              Civil Action No. 14-13694

                                               Honorable David M. Lawson

v.                                      Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 19]

      Plaintiff Debra Bethke ("Bethke") commenced this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed motions for summary judgment, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Bethke is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's motion for summary judgment [19] be GRANTED, Bethke's motion for summary judgment [16] be DENIED and, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.      REPORT

### A.      Procedural History

On June 8, 2012, Bethke filed the instant application for DIB, alleging an amended disability onset date of January 1, 2011. (Tr. 55-56, 230). On June 12, 2012, she filed the instant application for SSI, alleging the same disability onset date. (Tr. 64-65). Both claims were initially denied on August 17, 2012. (Tr. 63, 72). Thereafter, Bethke filed a timely request for an administrative hearing, which was held on April 15, 2013, before ALJ JoErin O'Leary. (Tr. 33-53). Bethke, who was represented by attorney John Wildeboer, testified at the hearing, as did vocational expert Michelle Ross. (*Id.*). In a written decision dated May 31, 2013, the ALJ determined that Bethke is not disabled. (Tr. 19-28). On July 30, 2014, the Appeals Council denied review. (Tr. 1-4) Bethke filed for judicial review of the final decision on September 24, 2014. (Doc. #1).

### B.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . [i]f the analysis [then] reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.   Background

### 1.   Disability and Function Reports

In a disability report from June 20, 2012, Bethke stated that she suffers from anxiety, depression, and bipolar disorder. (Tr. 160).  Bethke reported that she stopped working on January 1, 2005, as a result of these conditions. (*Id.*).  She indicated that several doctors had treated her for the above mental impairments. (Tr. 164-65).  At the time of the report, Bethke was taking multiple medications, including Abilify (for bipolar disorder), Ambien (for sleep disorder), Ativan (for anxiety), Lamictal (for depression and anti-seizure), Prozac (for depression), and

Vistaril (for depression). (Tr. 163).  Her updated disability report from August 31, 2012, noted that she was experiencing more anxiety attacks since her last report. (Tr. 214).  And Bethke reported that she was hospitalized at the McLaren Bay Regional Medical center on August 18, 2012, after experiencing a seizure. (Tr. 215).

In a function report dated July 15, 2012, Bethke stated that she lives in a house with her "friends." (Tr. 190).  When asked how her conditions limit her ability to work, Bethke responded that, "[m]y anxiety causes me not to be able to walk and talk.  My depression causes me to cry non-stop and think about suicide any way possible.  I also have very bad mood swings and that results in anxiety or depression." (*Id.*).  When asked to describe her daily activities, Bethke indicated that, "on a good day I wake up and take my meds, do some laundry and dishes.  On a bad day I am unable to do anything." (Tr. 191).  Bethke reported that she can no longer "[b]e in public alone" and that her mental conditions impair her ability to sleep. (*Id.*).  She indicated that she needs to be reminded to bathe and take care of her personal hygiene. (*Id.*).  She also noted that someone in her household provides her with daily medications so that she does not commit suicide. (Tr. 192).

Bethke stated that she is able to prepare breakfast cereal, sandwiches, and microwave foods, but has stopped cooking because she is unable to follow written directions. (*Id.*).  Regarding household chores, Bethke reported that she does the laundry and cleans the house on a monthly basis for an entire day. (Tr. 192).  She goes outside on a weekly basis and is able to ride in a car. (Tr. 193).  She shops for food once a month. (*Id.*).  She indicated that she no longer drives because her license has been suspended and she suffers from anxiety attacks. (*Id.*).  With respect to managing her finances, Bethke noted that she can no longer pay bills, count change, handle a savings account, or use a checkbook and money orders. (Tr. 193-94).

4

Under hobbies and interests, Bethke listed watching television and reading. (Tr. 194). For social activities, Bethke reported that she visits her parents on a weekly basis. (*Id.*). She stated that she needs someone to accompany her on her visits. (Id.). She does not have problems getting along with family, friends, neighbors, or others. (Tr. 195). When asked to describe the activities she could perform before the onset of her conditions that she can no longer perform, Bethke indicated that she "used to enjoy sports [and] gardening." (*Id.*).

When asked to identify functions impacted by her conditions, Bethke checked seeing, memory, completing tasks, concentration, understanding, following instructions and getting along with others. (Tr. 195). She can walk for two blocks before she needs to stop to rest for 10 minutes. (*Id.*). Bethke noted that she is not able to follow written instructions and that she "skip[s] things and then get[s] depressed." (*Id.*). She also has problems following spoken instructions due to lack of concentration, which ultimately results in anxiety attacks and depression. (*Id.*). She stated that she does not handle stress well on account of anxiety attacks; she does not handle changes in routine well; and she cannot be around large groups of people. (Tr. 196). She listed her medications, with accompanying side effects, as follows: Prozac (tiredness), Abilify (weight gain), Lamictal (forgetfulness), Ativan (tiredness), Ambien (unable to wake up in the morning), Uisteril (dry sinuses), and Oxybutynin (dry mouth and eyes).[1] (Tr. 197).

### 2. *Bethke's Testimony*

At the time of the April 15, 2013 hearing before the ALJ, Bethke was living with her boyfriend, his dad, and his brother. (Tr. 37). She testified that she does not perform any household chores on account of her anxiety. (*Id.*). The only time she leaves the house is when

---

[1] Bethke's friend, George Watson, drafted a third-party function report dated July 13, 2012. (Tr. 179-86). His report is largely consistent with Bethke's statements.

she attends therapist and psychiatrist appointments. (*Id.*). Bethke reported that she does not go shopping, or engage in social activities outside of her home because of the frequency (3-4 times per week) and duration (each one lasts for approximately 2-3 hours) of her anxiety attacks. (Tr. 38). Bethke noted that, in order to calm herself, "I have to lay down and it has to be quiet and dark and I have to have three to four blankets on top of me." (*Id.*). She stated that she had been fired from her prior employment as a healthcare worker because her anxiety attacks caused her to miss an inordinate amount of workdays. (Tr. 39). She also could not perform her job duties, such as cleaning or cooking for her clients. (Tr. 40).

With respect to medications, Bethke testified that she takes Lamictal (anti-seizure), Triptol, Klonopins, Abilify, Resoril, and Pristiq. (*Id.*). Her medications often cause drowsiness throughout the day and dizziness in the morning. (*Id.*). As for daily activities, Bethke generally watches television and reads. (Tr. 41). She reported that her attention span is so short that she can only read for 10 minutes at a time and she frequently changes the channels on her television due to lack of concentration. (*Id.*). Bethke indicated that she was hospitalized in August 2012 after suffering a seizure, though she has not suffered from any repeated episodes. (*Id.*). She also suffers from migraine headaches 2-3 times per week that cause her to vomit. (Tr. 42). Bethke treats her migraines with Fioricet and often lays down under blankets to shield her eyes from light. (*Id.*).

Bethke acknowledged that she had past convictions for heroin delivery in 2011 and two counts of "driving under the influence." (Tr. 43). She also admitted to past marijuana use, but denied using marijuana the night she experienced the seizure in August 2012. (*Id.*). Bethke testified that she began monthly treatments with a nurse practitioner in September 2012 and that she currently visits the practitioner once every three months. (Tr. 44-45). She stated that she

6

currently suffers from suicidal ideations and was hospitalized after a suicide attempt in 2008. (Tr. 45-46).

At the hearing, Bethke presented with her right arm in a sling to immobilize her shoulder. (Tr. 47). She indicated that she was scheduled to undergo an MRI the week after the hearing. (*Id.*). In the meantime, Bethke's nurse practitioner prescribed her Ibuprofen 800 to minimize her pain. (Tr. 48).

### 3.    *Medical Evidence*

The Court has thoroughly reviewed the record, and will discuss the relevant medical evidence within the analysis portion of this Report and Recommendation.

### 4.    *Vocational Expert's Testimony*

Michelle Ross testified as an independent vocational expert ("VE"). (Tr. 48-52). She initially identified Bethke's past work as a home attendant (semi-skilled, light as performed; semi-skilled, medium as generally performed) and cleaner (unskilled, light). (Tr. 49). The ALJ then asked the VE several hypotheticals, which were progressively more restrictive. (Tr. 59-61). The ALJ first asked the VE to imagine a claimant of Bethke's age, education, and work experience, who has no exertional limitations, but otherwise:

> should not perform any overhead reaching; they should not climb ladders or scaffolds; they should not work around unprotected heights or dangerous, moving, mechanical parts; and they would be limited to simple, routine, and repetitive tasks not performed at a production rate pace; they would be limited to simple work-related decisions; they should not be required to work with the general public; and they would be limited to tolerating relatively few changes in a . . . work routine setting.

(Tr. 50). The VE testified that the hypothetical individual would be unable to perform Bethke's past relevant work, but could perform (at the unskilled medium level) the positions of packager (7,200 jobs statewide), machine feeder (15,500 statewide), and (at the unskilled light level) the

7

position of light assembler (14,000 jobs statewide). (Tr. 51). The ALJ then inquired as to the availability of work if the hypothetical individual would not be able to maintain regular attendance and would be absent from work for more than four days per month. (*Id.*). The VE responded that there would be no work that such a hypothetical claimant could perform, and confirmed that her testimony comported with the Dictionary of Occupational Titles ("DOT"). (*Id.*).

On cross-examination, Bethke's attorney asked the VE to envision a claimant with the same restrictions as those imposed in the ALJ's first hypothetical, except with moderate limitations in simple job instructions requiring redirection and reinstruction by a supervisor at least twice a day regarding simple job instructions. (Tr. 52). The VE testified that such an individual would be precluded from working because they would be "off their target too much of the time." (*Id.*).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Bethke is not disabled under the Act. At Step One, the ALJ found that Bethke had not engaged in substantial gainful activity from the amended alleged onset date of January 1, 2011. (Tr. 21). At Step Two, the ALJ found that Bethke has the severe impairments of seizure disorder, migraine headaches, anxiety disorder, affective disorder, personality disorder, and substance abuse in sustained remission. (*Id.*). At Step Three, the ALJ found that Bethke's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 21-23). The ALJ then assessed Bethke's residual functional capacity ("RFC"), concluding that she is capable of performing a full range of work at all exertional levels with the following nonexertional limitations: no overhead reaching; no climbing of ladders or scaffolds; no exposure to

8

unprotected heights or dangerous moving mechanical parts; she can perform simple, routine, repetitive tasks with no production-rate paced work; she is limited to simple work-related decisions with few changes in routine work setting and no contact with the general public. (Tr. 23).

At Step Four, the ALJ determined that Bethke is unable to perform any past relevant work. (Tr. 26). At Step Five, based in part on the VE's testimony, the ALJ concluded that Bethke is capable of performing a significant number of jobs that exist in the national economy. (Tr. 27). As a result, the ALJ concluded that Bethke is not disabled under the Act. (Tr. 27-28).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Bethke v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (stating that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.    Analysis**

Bethke argues that the ALJ erred by: (1) failing to give controlling weight to the opinions of her treating nurse practitioner and treating psychologist; (2) affording "great weight" to the opinion of the state agency psychiatrist; (3) formulating an RFC assessment that did not incorporate any limitations on account of Bethke's migraine headaches; and (4) improperly discounting Bethke's subjective account of her migraine symptoms.  (Doc. #16 at 6-24).  Each of these arguments will be addressed in turn.

10

1.    *Medical Source Opinions*

Bethke maintains that the ALJ erred when she declined to give controlling weight to the opinions of her treating nurse practitioner, Kay McLaren, NP, and her treating psychologist, Deanna Hodgsen, M.A. (*Id.* at 6-17). She also contends that the ALJ erred by giving "great weight" to the opinion of the state agency consultant, Robert Newhouse, M.D. (*Id.* at 17-20). These arguments lacks merit.

Social Security regulations require ALJs to give treating source opinions controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" – such weight is only appropriate if the opinion is well-supported and consistent with the record as a whole. Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *5 (Jul. 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (stating that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating source's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §§

11

404.1527(c)(2), 416.927(c)(2) (requiring the ALJ to provide "good reasons" for the weight the given to treating source opinions); *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (providing good reasons does not entail "an exhaustive factor-by-factor analysis.").

Bethke's treating nurse practitioner, Kay McLaren, completed a medical source statement dated February 20, 2013. (Tr. 411-13). McLaren opined that Bethke has moderate limitations in following work rules, using her judgment, functioning independently, and maintaining attention and concentration. (Tr. 411). McLaren found that Bethke demonstrated marked limitations in dealing with the public, interacting with supervisors, and dealing with work stresses. (*Id.*). Regarding Bethke's ability to make job performance adjustments, McLaren indicated that Bethke has moderate limitations in executing complex, detailed, and simple job instructions. (Tr. 411-12). She also exhibited marked limitations in her ability to behave in an emotionally stable manner, and moderate limitations in relating predictably in social situations and demonstrating reliability. (Tr. 412). With respect to functional limitations, McLaren indicated that Bethke has moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, and pace, and a history of "one or two" extended episodes of decompensation. (Tr. 413).

In her written decision, the ALJ considered this medical opinion and properly accorded it little weight. (Tr. 25-26). To begin with, the ALJ correctly decided that McLaren's opinion was not entitled to controlling weight because, as a nurse practitioner, she is not an "acceptable medical source." *See* 20 C.F.R. §§404.1513(a), 416.913(a). Since only "acceptable medical sources" can give "medical opinions" within the meaning of the applicable regulations, McLaren's opinion would not necessarily be entitled to controlling weight pursuant to the treating source rule even if it had been well-supported by medically acceptable clinical and

12

laboratory diagnostic techniques and was not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).

Moreover, the ALJ appropriately discounted McLaren's opinion in light of the length (four months) and frequency (once a month) of the treatment relationship at the time McLaren proffered her opinion. (Tr. 44-45, 35). In a similar vein, the ALJ acted well within her discretion when she determined that the extensive limitations imposed by McLaren were not consistent with the "limited course of treatment" that she provided to Bethke. *See Francis*, 414 App'x at 806 (ALJ reasonably rejected treating source opinion where "limited treatment [w]as inconsistent" with his medical diagnosis). McLaren's earlier treatment notes also appear to contradict the severity of the limitations she recommended in her February 20, 2013 medical source statement. For instance, in a December 10, 2012 treatment note, McLaren observed that Bethke was alert and oriented. In fact, Bethke herself reported that her depression and the severity of her panic attacks had diminished. (Tr. 358). In another treatment note dated January 7, 2013, McLaren further stated that Bethke's racing thoughts had decreased with medication; her moods were less labile; and she did not exhibit evidence of psychosis. (Tr. 360). Consequently, the ALJ did not err by affording limited weight to McLaren's opinion.

The ALJ also correctly decided that Hodgsen's September 6, 2012 psychosocial assessment, in which she assigned Bethke a Global Assessment Functioning Score[2] of 40, was not entitled to controlling weight because, as a limited license psychologist, she is not an

---

[2] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 436 n.1 (6th Cir. 2012) (citations omitted).

13

"acceptable medical source." *See* 20 C.F.R. §§404.1513(a), 416.913(a); *see also McCommons v. Comm'r of Soc. Sec.*, No. 10-14992, 2012 U.S. Dist. LEXIS 77291, at *39 (E.D. Mich. Mar. 13, 2012) (stating that opinion of limited license psychological therapists "are not entitled to controlling weight.").

Furthermore, even if Hodgsen were an acceptable medical source, the ALJ appropriately discounted the GAF Score in question. (Tr. 26). In Administrative Message 13066 ("AM-13066"), dated July 22, 2013, the Social Security Administration established the following guidelines for reviewing GAF scores:

> [A] GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

"Global Assessment of Functioning (GAF) Evidence in Disability Adjudication," Social Security Administrative Message AM-13066, ¶ E; available at pp. 18-24 of the New York State Bar Association's seminar materials for "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (visited Jan. 11, 2015). Here, Hodgsen summarily assigned Bethke a GAF score of 40 without explaining the basis for this rating or whether it applied during a specified period in Bethke's clinical history. (Tr. 387). This GAF score is also belied by other evidence in the record demonstrating that Bethke's mental functioning varied between mildly impaired and stable and that she consistently exhibited appropriate appearance; orientation as to time, person, and place; lucid and coherent thought

14

content; organized thinking; and normal sensorium.[3]  (Tr. 391-408).  For the same reasons, the

GAF score alone cannot support a closed period of disability from the amended disability onset

date until September 6, 2012, the date that Hodgsen performed the psychological assessment.[4]

*See* AM-13066, *supra*.   Therefore, the ALJ's decision to give limited weight to Hodgsen's

psychosocial assessment is supported by substantial evidence in the record.

Finally, the Court finds that the ALJ did not err when she accorded "great weight" to Dr.

Newhouse's opinion that Bethke would function optimally "in small familiar groups" and that

she "retains the ability to do simple tasks on [a] sustained basis." (Tr. 62, 71).  Social Security

regulations provide that, "[i]n appropriate circumstances, opinions from State agency medical . . .

consultants . . . may be entitled to greater weight than the opinions of treating or examining

sources." Soc. Sec. Rul. 96-6p, 1996 SSR LEXIS 3 at *6-7 (Jul. 2, 1996).  "Once the ALJ

determine[s] not to accord" controlling weight to a treating source opinion, the ALJ need only

---

[3] A treatment note dated December 21, 2012 indicates that Bethke reported a suicide attempt a
month and a half earlier. (Tr. 405).  However, her therapy appointment the following week
shows normal mental status ratings and only mildly impaired functioning. (Tr. 406).

[4] The ALJ wrote that the GAF score "does not account for [Bethke's] recent improvement as
noted by unremarkable mental status and minimal impairment," but that "it shows the previous
condition of [Bethke]."  (Tr. 26, citing Tr. 400-08).  Bethke argues that because "the ALJ
Decision found that the GAF assessment of 40 'shows' [her] 'previous condition' as of
September 6, 2012, the ALJ Decision was required to determine whether the period of time [she]
was properly assessed with a GAF of 40 was for 12 consecutive calendar months or more prior
to the perceived 'period of improvement.'"  (Doc. #16 at 16).  This argument lacks merit as it
ignores the ALJ's assertion that a GAF score is simply an assessment of "how a patient is doing
on one particular day." (Tr. 26) (emphasis added).  Although the ALJ did note Bethke's "recent
improvement," there is no way to construe the ALJ as having concluded that the GAF score
established disability for any prior period of time, even one day.  Indeed, the ALJ found Bethke
had only "moderate" impairments in terms of social functioning and concentration, persistence
and pace.  (Tr. 22-23).  And, the ALJ found that "there is no objective evidence of a history of
inability to function outside a highly supportive living arrangement…"  (Tr. 23).  Finally, as the
Commissioner notes, the record is replete with evidence between March 2011 and August 2012
of Bethke being alert and appropriately oriented at her doctor's visits, and having "normal"
mental status exams.  (Tr. 320, 324, 334-39, 368, 418).

provide "'good reasons' for giving greater weight to the opinions of agency sources." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)).

In this case, a review of the ALJ's decision indicates that she acted in conformance with the above standard when she determined that Dr. Newhouse's opinion was entitled to "great weight" because: (1) his mental RFC assessment was consistent with the objective medical evidence in the record; and (2) he is a "highly qualified psychologist" and an expert "in the evaluation of medical issues in disability claims under the Act." (Tr. 26).  In particular, the ALJ properly found that Dr. Newhouse's RFC was consistent with treatment notes showing "relatively unremarkable mental status in treatment sessions that noted stable to mildly impaired function through February 2013." (Tr. 25; *see* Tr. 391-408).

The Court further notes that, contrary to Bethke's contention, there is "no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" than a treating source's opinion.  *Helm*, 405 F. App'x at 1002. Nor does Bethke highlight anything in the record that would justify imposing a particular set of limitations beyond those recommended by Dr. Newhouse.  As a result, the Court perceives no error in the ALJ's treatment of Dr. Newhouse's mental RFC assessment.

### 2. *RFC Assessment and Credibility Determination*

Bethke argues that the ALJ's RFC assessment is incomplete because it fails to account for limitations stemming from her migraine headaches.  More specifically, she assigns error to the fact that "[t]here is no provision in the RFC for any days of missed work, unscheduled breaks, or periods of time when she would be off task as a result of symptoms from migraine headaches." (Doc. # 16 at 21).  A review of the record shows that the ALJ committed no error

with respect to this issue.

In support of her contention, Bethke highlights no clinical evidence or medical opinions that would warrant imposing any RFC limitations resulting from her alleged migraine condition. On the contrary, the record shows that Bethke reported to nurse practitioner Heather Prior on August 14, 2012, that she suffered from migraines one to two times per week "for years" and that conservative treatment with Motrin, Ibuprofen and rest typically alleviated her symptoms. (Tr. 365). At a doctor's appointment on November 9, 2012, Bethke "denie[d] headaches" altogether. (Tr. 349-50). After Prior prescribed Fioricet to treat future headaches (Tr. 368), Bethke reported in February 2013 that her migraines "improved greatly." (Tr. 370). And Bethke stated that limiting her caffeine intake–she acknowledged drinking one liter of soda per day–had "helped" her migraine headaches. (*Id.*).

In her decision, the ALJ sufficiently discussed the medical evidence related to Bethke's migraine condition in conformance with Soc. Sec. Rul. 96-8p to support her RFC.[5] The record includes a letter from Bethke's attorney in which he notes that Bethke went to the emergency room on August 14, 2012, for a "one-time event" – a seizure, and that "she had a migraine at the time of this and wonders if that might have triggered the seizure." (Tr. 364). In his Step Three

---

[5] "Although a function-by-function analysis is desirable, S.S.R. 96–8p does not require ALJs to produce such a detailed statement in writing. . . . [T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.,* 30 F. App'x 542, at 547-548 (6th Cir. 2002) (citations and quotation marks omitted); *see also, e.g.*, *Knox v. Astrue,* 327 F. App'x 652, 657–58 (7th Cir. 2009) ("Although the 'RFC assessment is a function-by-function assessment,' S.S.R. 96–8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient."); *Tobey v. Comm'r of Soc. Sec.*, No. 11-15069, 2013 WL 1010727, at *11 (E.D. Mich. Feb. 22, 2013), *adopted by* 2013 WL 1016736 (E.D. Mich. Mar. 14, 2013) (finding that the"[t]he ALJ . . . sufficiently articulated his residual functional capacity finding under S.S.R. 96–8p" because he "discussed the medical and other evidence on the disputed issues and his narrative discussion adequately explained the basis of plaintiff s RFC").

analysis the ALJ found that Bethke's "migraine headaches fail to meet or medically equal Listing 11.00 (Neurological) . . . because the evidence fails to show any neurological deficits." (Tr. 22). The ALJ referenced Bethke's hearing testimony where she complained of "headaches 2-3 times a week with the need to lie down in a dark room," (Tr. 24), but ultimately found that testimony was belied by the clinical and other evidence in the record. (Tr. 25). For instance, referencing the August 2012 emergency room visit, the ALJ noted that "[i]n terms of [Bethke's] seizure disorder and migraine headaches, she sought emergency treatment for a seizure [due to an] overdose of medication and using marijuana…[which she took] basically to get high.'" (Tr. 24, quoting Tr. 445). The ALJ noted that "[n]eurologically and psychiatrically, she was alert, responsive, and responding to questions appropriately." (Tr. 24, quoting Tr. 445). The ALJ referenced a neurologist's note that "no particular workup was done at that time…[but that Bethke] did notice that she had a headache all day long that particular day.'" (Tr. 24-25, quoting Tr. 349). The ALJ went on to cite a brain MRI from that same time period which showed mostly "unremarkable findings." (Tr. 25, citing Tr. 440-41). In short, Bethke's assertion that the ALJ "failed to discuss any of the medical records relating to [her] migraine headaches," (Doc. #16 at 20), lacks merit, and the ALJ was able to "consider all evidence without directly addressing in [her] written decision every piece of evidence submitted by [Bethke]." *Kornecky*, 167 F. App'x at 508 (quoting *Loral*, 200 F.3d at 453).

Similarly, Bethke's argument that the ALJ mistakenly rejected her subjective accounts of migraine symptoms is unavailing. The Sixth Circuit has held that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y*

*of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not required to simply accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. Soc. Sec. Rul. 96-7p, 1996 SSR LEXIS 4, at *2 (Jul. 2, 1996); *see also* 20 C.F.R. §416.929.

In this case, after finding that Bethke suffers from the severe impairment of migraine headaches (Tr. 21), the ALJ concluded that she still retains the residual functional capacity to perform a full range of work at all exertional levels. (Tr. 23).  In reaching this conclusion, the ALJ specifically referenced Bethke's testimony about the frequency and severity of her headache symptoms. (Tr. 24).  Indeed, she also examined a November 2012 treatment note from Dr. Al-Qasmi, in which Bethke reported that she was suffering from a headache on the same day that she was later hospitalized for a seizure. (Tr. 25; *see* Tr. 349).  Nonetheless, while the ALJ found that Bethke's condition could reasonably be expected to produce the alleged symptoms, the ALJ also found that her statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (Tr. 24-25).  In reaching this conclusion, the ALJ specifically considered Bethke's activities of daily living, prior statements and reports contained in the record, and the objective medical evidence.

19

(*Id.*).

As stated above regarding the objective medical evidence, the ALJ noted that Bethke's brain MRI "was largely unremarkable" and that her treatment history "has been routine and conservative . . ." (Tr. 25; *see* Tr. 440-41). By February 2013, Bethke herself reported that her migraines had "greatly improved" after receiving a prescription for Fioricet and limiting her caffeine intake. (Tr. 370). Such objective evidence is a "useful indicator" for an ALJ to use when evaluating the credibility of a claimant's symptoms. *See* 20 C.F.R. §416.929(c)(2) ("Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").

In addition, while assessing the credibility of Bethke's allegations, the ALJ noted that, despite her allegations of disabling symptoms, she performs occasional household chores and is able to independently take care of her personal needs. (Tr. 25). The record reflects that she is able to attend alcohol support groups once every two months and keep up with her doctors' appointments. (Tr. 25, 37). Bethke reported that she goes out to the store and visits her family on a weekly basis. (Tr. 25, 37-38). She also acknowledged having sufficient concentration to read, watch television, and shop. (*Id.*). Thus, it was entirely appropriate for the ALJ to consider the fact that Bethke's ability to perform daily activities is less limited than one would expect, given her allegations of disabling symptoms. *See Walters*, 127 F.3d at 532 (an ALJ may consider household and social activities in evaluating the credibility of the claimant's allegations of disabling symptoms).

Finally, the ALJ noted inconsistencies between Bethke's testimony that she could not leave her home and evidence in the record of several criminal convictions. One of these

convictions – for drug delivery – occurred during the alleged disability period, which, as the ALJ noted, exhibited at least some level of social interaction beyond Bethke's self-reported limitations. (Tr. 25, 43).  Again, the inconsistencies between these statements were appropriate considerations in evaluating Bethke's credibility. *See Hairston v. Comm'r of Soc. Sec.*, No. 14-13218, 2015 U.S. Dist. LEXIS 101715, at *19 (E.D. Mich. Aug. 3, 2015) (factors relevant to credibility include "the consistency of the claimant's statements, both internally and with other information in the record").

In sum, the ALJ recognized the duty imposed upon her by the regulations and appropriately considered Bethke's activities of daily living, prior statements and reports, and the objective medical evidence.  Accordingly, the ALJ's credibility determination is supported by substantial evidence and should not be disturbed.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's motion for summary judgment [19] be GRANTED, Bethke's motion for summary judgment [16] be DENIED, and the Commissioner's decision be AFFIRMED.


Dated: January 22, 2016                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 22, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager